**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-7362

MATTHEW JAMES GRIFFIN,

Plaintiff – Appellant,

v.

NADINE J. BRYANT; P. M. MANNION; ARLENE BURGRESS TOODLE; M.
A. KHAN; M. BOSSIE; BYRON SCOTT CARTER; UNKNOWN DOE 1, Nurse;
UNKNOWN DOE 2, Correctional Officer (aka Dervin),

Defendants – Appellees.

------------------------------

AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES
UNION OF NORTH CAROLINA LEGAL FOUNDATION; DISABILITY
RIGHTS NORTH CAROLINA; EMANCIPATE NC; NORTH CAROLINA
PRISONER LEGAL SERVICES, RIGHTS BEHIND BARS,

Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh.  Richard E. Myers II, Chief District Judge.  (5:17-ct-03173-M)

Argued:  October 28, 2022                    Decided:  December 27, 2022

Before KING and HARRIS, Circuit Judges, and Michael S. NACHMANOFF, United
States District Judge for the Eastern District of Virginia, sitting by designation.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Harris and Judge Nachmanoff joined.

———————————

**ARGUED:** Benjamin Thomas Gunning, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Appellant. Stephanie A. Brennan, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Jennifer Dotson Maldonado, YATES MCLAMB & WEYHER, LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Easha Anand, San Francisco, California, Rosalind Dillon, Chicago, Illinois, Devi M. Rao, Katherine Cion, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Appellant. Joshua H. Stein, Attorney General, Sripriya Narasimhan, Deputy General Counsel, Bryan Nichols, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees Bryant, Mannion, Toodle, Bossie, Carter, and Unknown Does. Suzanne R. Walker, YATES MCLAMB & WEYHER, LLP, Raleigh, North Carolina, for Appellee M.A. Khan, M.D. Kristi Graunke, Daniel K. Siegel, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Jennifer Wedekind, Washington, D.C., Ryan J. Murguia, AMERICAN CIVIL LIBERTIES UNION, San Francisco, California, for Amici The American Civil Liberties Union, The American Civil Liberties Union of North Carolina Legal Foundation, Disability Rights North Carolina, Emancipate NC, North Carolina Prisoner Legal Services, and Rights Behind Bars.

———————————

2

KING, Circuit Judge:

Plaintiff Matthew James Griffin appeals from the decision rendered in the Eastern District of North Carolina in 2021 granting summary judgment to several officials of North Carolina's Central Prison (the "Central Prison defendants"), against whom Griffin — a Central Prison inmate — pursued various state and federal claims. *See Griffin v. Bryant*, No. 5:17-ct-3173 (E.D.N.C. Mar. 29, 2021), ECF No. 128 (the "Summary Judgment Order"). In awarding judgment to the Central Prison defendants, the district court ruled that Griffin had failed to exhaust all administrative remedies available to him prior to filing his lawsuit in federal court, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (the "PLRA"). In these circumstances, however, the record presents numerous disputed issues of material fact about how North Carolina's prison grievance procedure functions and is administered, including whether Griffin failed to exhaust administrative remedies of his own accord and whether such remedies were meaningfully "available" to him. Accordingly, because the district court's award of summary judgment was erroneously premature and otherwise flawed, we are constrained to vacate and remand.

I.

A.

Griffin is a New Mexico citizen who, at all times relevant here, was incarcerated at Central Prison, a North Carolina correctional facility located in Raleigh.[1]  Central Prison adheres to the internal grievance procedure established and maintained by the North Carolina Department of Public Safety's Division of Prisons, formally known as the "Administrative Remedy Procedure" (hereinafter the "grievance procedure").  *See* J.A. 104.[2]  The parties characterize certain aspects of the grievance procedure's operation differently, but generally agree that it functions as follows.

First, prison inmates are required to file written grievances within 90 days of the incident that gives rise to the grievance.  Once a grievance has been submitted, "screening officers" have three days to determine whether the grievance should be accepted for review or rejected, based on compliance with certain technical rules.  *See* J.A. 106.  If the grievance is accepted, prison officials are required to issue a formal written response to the aggrieved inmate within 15 days, which is referred to as "Step 1" of the grievance procedure.  *Id.* at 110.  If the aggrieved inmate is dissatisfied with the "Step 1" decision (whether the decision

---

[1] We recite the relevant facts, as the district court was also obliged to do, in the light most favorable to Griffin, who was the nonmoving party with respect to the Central Prison defendants' summary judgment motions.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.  Citations to "S.J.A. __" refer to the contents of the Supplemental Joint Appendix.

is an outright denial of the grievance or otherwise), the inmate is entitled to appeal the decision to "Step 2" — though the grievance procedure's terms are unclear as to how those appeals are taken. In any event, at "Step 2," prison officials must review the pending grievance and provide another written response, this time within 20 days of the date of the inmate's appeal. *Id.* at 111. And if the inmate is dissatisfied with the "Step 2" decision, he is entitled to appeal to "Step 3" — the final stage of the grievance procedure, which mandates a review by North Carolina's Secretary of Public Safety. *Id.* at 112. Of importance here, the grievance procedure bars an inmate from having more than one grievance pending at or before the "Step 2" review. That is, if an inmate has a grievance in the system, he cannot file another grievance until the pending grievance either passes the "Step 2" review stage (i.e., by being appealed to "Step 3") or is resolved. *Id.* at 106.

Relative to the right to appeal, the grievance procedure specifies that, "[i]f at any level of the administrative remedy process, including the final level, the inmate does not receive a response within the time provided for reply . . . the absence of a response shall be a denial at that level which the inmate may appeal." *See* J.A. 108. The Central Prison defendants refer to the right to appeal "the absence of a response" as an appeal from a "de facto denial" of a grievance. *See* Br. of Appellees 14-15. Yet, on that point, the grievance procedure contradicts itself in two critical and somewhat confounding respects.

First, the grievance procedure contradicts itself by requiring that an appeal from any "Step" "be made in writing on Form DC-410," i.e., the official form of the prison system on which written decisions are returned to aggrieved inmates. *See* J.A. 111-12. But nothing in the procedure explains how an aggrieved inmate can obtain a blank Form DC-

5

410 if prison officials fail to timely respond to his grievance — evidently leaving him without the ability to notice an appeal from the so-called "de facto denial." Second, the procedure separately contradicts itself by providing that "[i]f, at any step of the procedure, a response is not made within the prescribed time limits, the grievance will be forwarded to the next step for review." *Id.* at 107. And another section similarly provides that, "[i]f at any step of the procedure, the inmate refuses to sign the DC-410 indicating his/her desire to appeal, the DC-410 will automatically be forwarded to the next step in the [procedure]." *Id.* at 112. Those provisions thus suggest that there is no need for an inmate to appeal when prison officials fail to respond to his grievance, because the grievance will automatically proceed to the next "Step." As the facts of this case illustrate, however, that is not always what occurs.

## B.

Griffin arrived at Central Prison in October 2015. On October 27, 2015, Griffin filed a written grievance requesting to be placed on a Kosher diet (the "Kosher diet grievance"). That grievance was accepted for review on October 29 and, on October 30, prison officials placed Griffin on a Kosher diet — favorably resolving his grievance before a written "Step 1" response was issued. For unknown reasons, however, the Kosher diet grievance filed by Griffin was never formally removed from the grievance system. The Central Prison defendants blame Griffin for failing to "dismiss" his Kosher diet grievance, but it is not clear what, if any, ability aggrieved inmates have — under the grievance procedure — to unilaterally "dismiss" their grievances. *See* Br. of Appellees 9. That is, the grievance procedure does not contemplate such an option.

6

The events underlying this litigation took place in late November 2015. Griffin suffers from a variety of severe vision impairments that place him at a heightened risk of falling, and prison officials accordingly directed that he be assigned to a handicapped-accessible cell, sleep in the cell's bottom bunk, and not be required to climb stairs. On November 22, 2015, Griffin was assigned to a prison hospital cell pending the availability of a cell that was compliant with the Americans with Disabilities Act ("ADA"). On November 25, Griffin began complaining to prison staff about his cell assignment, but his requests to be transferred to an ADA-compliant cell were rebuffed. On November 26, defendant Nadine Bryant — a Central Prison nurse — advised Griffin that, "[i]f you continue to wake us up to complain about the ADA I'm going to have you involuntarily medicated." *See* J.A. 32. Griffin persisted with his complaints and, in the early morning hours of November 27, Bryant made good on her threat — she and several other named Central Prison defendants entered Griffin's cell, forced him to the floor, and involuntarily sedated him.[3] Left unsupervised, Griffin awoke hours later and stumbled and fell in his cell, striking his head and dislocating his left shoulder.

Griffin filed a written grievance regarding the involuntary sedation incident (the "sedation grievance") later that same day — November 27, 2015. On November 30, however, Griffin's sedation grievance was "returned" to him because his Kosher diet

---

[3] Defendants Bryant, Mannion, Toodle, Bossie, Carter, "Unknown Doe 1," and "Unknown Doe 2" were directly involved in involuntarily sedating Griffin. Meanwhile, defendant Khan — a Central Prison doctor — supplied Bryant with an emergency medical order authorizing the sedation.

grievance of October 27 was deemed yet pending at "Step 1." *See* J.A. 119. That is, because the Kosher diet grievance had never formally been resolved by a written response or forwarded to "Step 2," application of the grievance procedure's "one-grievance-at-a-time" rule barred Griffin from filing the sedation grievance or any further grievances.

From then on, the Kosher diet grievance apparently languished somewhere in the prison's grievance system, still on the books yet seemingly forgotten. Griffin took no action to "appeal" the Kosher diet grievance through the procedure's various "Steps," though it is unclear whether he was able to institute such an appeal (given the lack of a written response on a Form DC-410), or whether he believed that he needed to do so (given that he had already prevailed and been placed on a Kosher diet). In any event, on January 4, 2016, Griffin filed a new grievance. The new grievance related to inadequate treatment of a skin condition from which Griffin suffered (the "inadequate care grievance"). On January 6, despite no action having been taken on the Kosher diet grievance, the inadequate care grievance was accepted for review. Thus, Griffin then had two grievances — the Kosher diet grievance and the inadequate care grievance — pending in the system that had not yet cleared "Step 2" review, in violation of the grievance procedure.[4]

After erroneously accepting Griffin's inadequate care grievance for review, prison officials denied it by a written "Step 1" response issued on January 12, 2016. On January 21, Griffin appealed the denial of his inadequate care grievance to "Step 2." Prison officials

---

[4] No explanation has ever been given — either by prison officials at the time, or by the Central Prison defendants in this litigation — as to why the inadequate care grievance was accepted into the system alongside the Kosher diet grievance while the sedation grievance was not.

failed to reply to that appeal within 20 days (by February 10), instead issuing a written response on February 24, which Griffin appealed to "Step 3" on February 26.

In the meantime, on February 5, 2016, prison officials forwarded the Kosher diet grievance — which had by then been left stagnant in the grievance system for more than three months — to "Step 2," citing "the timeframe violation." *See* S.J.A. 5. And on February 10, using the Form DC-410 which provided him with notice of that action, Griffin appealed the Kosher diet grievance to "Step 3." *See id.* at 3, 5. Thus, as of February 26, Griffin no longer had any grievances pending at or before "Step 2," apparently enabling him to resubmit his sedation grievance. But the day prior — that being February 25 — was precisely 90 days after November 27, 2015, the date that the Central Prison defendants had involuntarily sedated Griffin. Consequently, the grievance procedure's 90-day filing limitation then — according to the parties — stood in the way of the sedation grievance being reviewed. Indeed, when Griffin resubmitted that grievance on April 29, 2016, it was rejected as untimely.[5]

---

[5] Given the progression of this timeline, it appears that Griffin might have been able to timely resubmit his sedation grievance on February 25, 2016, had he appealed the inadequate care grievance to "Step 3" on that date instead of on February 26, 2016. But the parties fail to discuss the intersection of those dates in their appellate submissions, and they also inaccurately recount how the Kosher diet grievance was disposed of in February 2016. The Central Prison defendants, for their part, wrongly assert that Griffin did not appeal that grievance to "Step 3" at all, and say that prison officials instead automatically forwarded the grievance to "Step 3" on February 25. The parties also fail to explain how or why Griffin was able to appeal his various grievance decisions multiple days after receiving them, when the grievance procedure expressly provides that appeals must be taken within 24 hours of a decision being rendered. *See* J.A. 107. These ambiguities only contribute to our conclusion that the record in its present state leaves open too many issues of material fact for an award of summary judgment to be sustained.

C.

Ostensibly left with no further way to seek relief in the North Carolina prison system, Griffin turned to the federal court system. Proceeding pro se, Griffin initiated this action against the Central Prison defendants in the Eastern District of North Carolina on June 30, 2017. By his complaint, Griffin pursued three claims, alleging that (1) under 42 U.S.C. § 1983, the Central Prison defendants' actions during the involuntary sedation incident constituted deliberate indifference to his serious medical needs, in contravention of the Eighth and Fourteenth Amendments; (2) the defendants retaliated against him for making complaints under the ADA and the Rehabilitation Act; and (3) by sedating him and leaving him unsupervised, the defendants were negligent under North Carolina tort law.

In December 2019, defendants Matthew Bossie and M.A. Khan filed motions to dismiss Griffin's complaint for failure to exhaust all available administrative remedies related to the involuntary sedation incident, as required by the PLRA. Griffin opposed the motions, asserting that no administrative remedies were "available" to him with respect to the sedation grievance, such that the PLRA's exhaustion requirement was no bar to his civil complaint. By order of September 5, 2020, the district court converted the motions to dismiss into motions for summary judgment, notifying the parties of a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *See* J.A. 12. Griffin filed another response in opposition to the summary judgment motions, reiterating his "unavailability" arguments.

On March 29, 2021, the district court awarded summary judgment to the Central Prison defendants, ruling that Griffin's federal claims were barred by his failure to exhaust

available administrative remedies.  Observing that Griffin's sedation grievance had first been "returned" due to the Kosher diet grievance and was ultimately rejected under the grievance procedure's 90-day filing limitation, the court resolved that the "undisputed evidence" demonstrated that "no grievance pertaining to the relevant claims" had "completed the three-step administrative remedy procedure," such that Griffin "failed to exhaust administrative remedies prior to filing this action." *Id.* at 14-15.  The court briefly acknowledged Griffin's "unavailability" contentions, but summarily concluded that the grievance procedure made internal remedies fully available to him.  Accordingly, the court rejected Griffin's constitutional and federal statutory claims, declined to exercise supplemental jurisdiction over his state law tort claim, and ordered the case closed.

Griffin thereafter moved for relief from the district court's Summary Judgment Order pursuant to Federal Rule of Civil Procedure 60(b), alleging errors in the court's analysis.  The court denied Griffin's motion by order of September 22, 2021.  On September 26, 2021, Griffin appealed from the Summary Judgment Order and the order denying relief under Rule 60(b).  We possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

On appeal, Griffin maintains his position that the North Carolina prison grievance procedure did not leave any administrative remedies "available" to him as contemplated by the PLRA.  As such, he argues that the district court erroneously granted the Central Prison defendants' summary judgment motions on exhaustion grounds.  We review de novo a district court's award of summary judgment.  *See Moss v. Harwood*, 19 F.4th 614,

11

621 (4th Cir. 2021). Summary judgment is appropriate only if "no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Id.* In conducting our assessment, we view the facts in the light most favorable to Griffin, the non-moving party. *Id.* at 617.

III.

A.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions" under 42 U.S.C. § 1983 "or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *See* 42 U.S.C. § 1997e(a).[6] The statute's exhaustion requirement is strict, intended to "reduce the quantity and improve the quality of prisoner suits." *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Yet the exhaustion requirement does not operate as an absolute bar to prison litigation in federal court — rather, it sets forth a "built-in exception," specifying that a prisoner "need not exhaust remedies if they are not 'available.'" *See Ross v. Blake*, 578 U.S. 632, 635-36 (2016).

In its important 2016 decision in *Ross v. Blake*, the Supreme Court recognized that, although the PLRA's "mandatory language means a court may not excuse a failure to

---

[6] By its terms, the PLRA's exhaustion requirement applies not only to claims pursued under § 1983 — here, Griffin's Eighth and Fourteenth Amendment "deliberate indifference" claim — but also applies to claims initiated under "any other Federal law," including Griffin's claim under the ADA and the Rehabilitation Act.

exhaust, even to take [special] circumstances into account," the statute spells out a crucial "limitation on an inmate's duty to exhaust" administrative remedies — "[he] need not exhaust unavailable ones." *See* 578 U.S. at 639, 642. Pursuant to *Ross*, if a prison grievance procedure's provided avenues for recourse are not meaningfully "capable of use to obtain some relief for the action complained of," the exhaustion requirement "does not come into play." *Id.* at 642-43 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001) (internal quotation marks omitted)). And the *Ross* Court identified three circumstances where an administrative remedy, "although officially on the books, is not capable of use to obtain relief": (1) where the remedy "operates as a simple dead end," with prison officials "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where an administrative scheme is "so opaque" that it is "practically . . . incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.

B.

1.

Here, Griffin focuses his challenge to the district court's Summary Judgment Order on the question of "availability," and thus on *Ross*'s examples of grievance procedures that are not truly "capable of use." Griffin contends that, when viewed cumulatively, the North Carolina grievance procedure's "one-grievance at a time rule," its 90-day filing limitation, the failure of prison officials to timely dispense with his Kosher diet grievance, plus the erroneous acceptance of his inadequate care grievance, presented him with a "simple dead

13

end" and allowed the Central Prison defendants to "thwart" his pursuit of the sedation grievance. *See Ross*, 578 U.S. at 643-44. Griffin accordingly maintains that he was under no obligation to exhaust the grievance procedure's provided remedies concerning the sedation grievance before filing this lawsuit. He thus requests that we reverse the Summary Judgment Order and remand so that he may proceed to the merits of his claims.

The Central Prison defendants, for their part, insist that remedies remained open to Griffin, that he failed to make use of them, and that he "cannot be excused for failing to help himself." *See* Br. of Appellees 34. The Central Prison defendants argue that Griffin simply should have "dismissed" the "moot" Kosher diet grievance, so as to make way for his sedation grievance to be filed at any time between November 2015 and January 2016. *Id.* at 19. And the crux of the defendants' argument likewise places the blame on Griffin: they maintain that he should have appealed the "de facto denials" of the Kosher diet grievance through the various "Steps" of the grievance procedure when the procedure's timetables so allowed, thereby enabling him to timely file the sedation grievance as early as December 3, 2015 — well in advance of the 90-day filing deadline that purportedly expired in February 2016.[7]

---

[7] In support of their assertion that Griffin could properly have filed the sedation grievance on December 3, 2015, the Central Prison defendants explain that Griffin could — at least in theory — have appealed the first "de facto denial" of the Kosher diet grievance to "Step 2" on November 13, 2015, 15 days after that grievance was accepted for "Step 1" review on October 29, 2015. And then, say the Central Prison defendants, assuming another lack of a written response to the already-resolved grievance, Griffin could have moved the grievance on to "Step 3" 20 days later — that is, December 3 — so as to clear the system of any grievances pending at or before "Step 2" review.

The parties, to their credit, have sought to make some sense of the grievance procedure's rules — and their seemingly inconsistent administration — with the information available. Yet the record before us presents disputes of material fact that preclude a court from passing upon the questions of what, exactly, led to Griffin's failure to exhaust the remedies provided by the grievance procedure and, ultimately, whether those remedies were really "available" to Griffin within the meaning of the PLRA. Perhaps the lawyer for defendant Khan put it best at oral argument when she acknowledged that she had "never seen a situation like this come up . . . where it doesn't appear directly in the record what happened." *See* Oral Argument at 38:37-:54, *Griffin v. Bryant*, No. 21-7362 (4th Cir. Oct. 28, 2022), https://www.ca4.uscourts.gov/OAarchive/mp3/21-7362-20221028.mp3.

2.

For starters, much is left unanswered regarding how the grievance procedure actually operates and is carried out by North Carolina prison officials, particularly with respect to the procedure's appeals system. The record is silent as to how aggrieved inmates are to appeal from "the absence of a response" to a grievance, or from the so-called "de facto denial." Although the grievance procedure provides that appeals are ordinarily taken by checking a box on Form DC-410, what is the inmate to do when no response on that Form ever materializes — i.e., what mechanism is then used for an appeal?[8]

---

[8] Strikingly, nothing in the record indicates that an appeal from a "de facto" grievance denial has ever occurred in the North Carolina prison system.

15

The grievance procedure is also self-contradictory when it comes to untimely (or simply non-existent) grievance responses, suggesting that if "a response is not made within the prescribed time limits, [a] grievance will be forwarded to the next step for review." *See* J.A. 107. The Central Prison defendants, however, have made no explanation as to why the lack of a formal written response to the Kosher diet grievance did not result in its automatic "forwarding" to "Step 2" as early as November 2015. Put simply, these uncertainties regarding the grievance procedure's timelines and its rules for appeals undermine the Central Prison defendants' core contention that Griffin's failure to appeal the Kosher diet grievance should be blamed for his ultimate failure to exhaust the procedure's administrative remedies. And there is no documentation in the record that speaks to whether inmates actually have the option to singlehandedly "dismiss" their grievances, as the Central Prison defendants maintain.

The general inquiry regarding "exhaustion" is similarly muddied. Certainly, Griffin never received any formal resolution of or response to his sedation grievance, and he did not shepherd it through the grievance system's three-tiered review process. Instead, his final action was to resubmit the sedation grievance on April 29, 2016, only to have it rejected because it "[e]xceed[ed] [the] 90 day time limit." *See* J.A. 149. Yet an open question remains whether that resubmission should have been deemed timely. The grievance procedure requires inmates to file grievances within 90 days of the event that they complain of, but Griffin readily satisfied that deadline — he filed the sedation grievance on November 27, 2015, the very day the Central Prison defendants involuntarily sedated him. The grievance procedure is unclear as to what happens to a timely filed

16

grievance that cannot be considered because another grievance is pending. What if the second, timely filed grievance is later resubmitted — can it then be reviewed anew at "Step 1"? That is, does the grievance procedure use any sort of tolling rule?

Though the parties failed to discuss the point in their briefs, the record suggests that the grievance procedure has a tolling rule. When Griffin resubmitted his sedation grievance in April 2016, he attached a "North Carolina Grievance Tracking Form" labeled "Form L-22," which made note of "[d]ays remaining to submit grievance after equitable tolling of 90 day period for grievance(s) still pending at Step-Two." *See* J.A. 146. Little to no other information is available about the "Form L-22" — counsel were unable to clarify at oral argument where the L-22 Form comes from, or even whether it is an official form of the prison system. But accepting that the grievance procedure has a 90-day tolling rule, 87 days remained for Griffin to resubmit his sedation grievance when it was "returned" to him on November 30, 2015. And in that event, April 29, 2016 — 63 days after February 26, 2016, when Griffin appealed his inadequate care grievance to "Step 3" — would have made for a timely resubmission date. Of course, if Griffin had been permitted to resubmit the sedation grievance in April 2016, that would bar any finding that the grievance procedure was "unavailable" to him. But we only seek to emphasize the extent to which the facts surrounding this issue remain in doubt.

Finally — and again on the matter of "unavailability" — further development of the record should reveal whether the grievance procedure was "capable of use to obtain some relief for the action complained of." *See Ross*, 578 U.S. at 642. To be sure, Griffin makes a compelling case that the grievance procedure's overlapping rules and deadlines presented

17

him with "a simple dead end," that the facts invite at least an inference of "thwarting" and "machination" by prison officials, and even that, in the words of the Supreme Court in *Ross*, "no ordinary prisoner can discern or navigate" the grievance procedure because it is "so opaque." *Id.* at 643-44. Nevertheless, an abundance of loose ends feed into the question of whether administrative remedies were functionally available to Griffin — and not just those discussed here. We identify just a few.

Why, for instance, was Griffin's Kosher diet grievance left to languish in the system after it had been favorably resolved almost immediately? Why did prison officials accept and respond to Griffin's inadequate care grievance, in plain contravention of their "one-grievance-at-a-time" policy? And why was the apparently moot Kosher diet grievance suddenly forwarded to "Step 2" in February 2016, just days before the supposed filing deadline for the sedation grievance? The facts of record present the actual possibility that Griffin faced "a real world 'Catch 22,' a dilemma from which there is no escape, one in which the only solution is denied by a circumstance inherent in the problem." *See Eaton v. Blewett*, 50 F.4th 1240, 1243 (9th Cir. 2022). But the record leaves too much to speculation for us to now decide that Griffin's failure to exhaust the grievance procedure's remedies should be excused because those remedies were not, in truth, "available" to him.

\* \* \*

It is clearly unsettled on this record how the prison system's grievance procedure functions — on paper and in practice — and what actually occurred between October 2015 and April 2016 as Griffin's various grievances were being considered. In our view, the record leaves unresolved at least the following issues of material fact:

18

- How aggrieved inmates are to institute appeals from so-called "de facto denials";

- Why "de facto denials" are not automatically forwarded to the next "Step" in the grievance procedure, as the procedure's rules require;

- Whether aggrieved inmates have the ability to "dismiss" their own grievances from the system;

- Whether the grievance procedure contains an equitable tolling rule and, if so, whether Griffin's April 2016 resubmission of his sedation grievance should have been deemed timely;

- Why the Kosher diet grievance was left stagnant after its October 2015 resolution, and why that grievance was only forwarded to "Step 2" months later, in February 2016; and

- Why the inadequate care grievance was allowed into the system alongside the Kosher diet grievance, but the sedation grievance was rejected.

In view of those uncertainties, the district court prematurely awarded summary judgment to the Central Prison defendants on the basis that administrative remedies remained available to Griffin and that his failure to exhaust such remedies barred his federal lawsuit under the PLRA. Put simply, the facts as they are known do not justify an award of judgment as a matter of law. On remand, appropriate discovery and development of the record — including stipulations that the lawyers should seek and present, as well as affidavits providing relevant information — will assist the court in resolving this litigation.

## IV.

Pursuant to the foregoing, we vacate the Summary Judgment Order and remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*